# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

_____

### Docket No. 4:19-CR-00488

_____

### UNITED STATES OF AMERICA

v.

### MARIBEL SANTANA-CERANO

_____

### EXPEDITED MARIBEL SANTANA CERANO'S
### MOTION FOR COMPASSIONATE RELEASE

_____

**TO THE HONORABLE RANDY CRANE:**

Now comes Movant, **MARIBEL SANTANA CERANO** (sometimes herein Ms. Cerano), Register Number 998777-479, through her counsel, and seeks this court to grant her compassionate release, and for expedition due to the need for free world immediate medical care, from Carswell FCI Federal Prison to time served or home confinement pursuant to The United States Attorney General's written directives, 18 U.S.C. Section 3582(c)(1)(A)(i), Section 1B1.13 of the US Sentencing Guidelines, BOP program statement 5050.50 and 28 CFR Section 571.61 and other law.

Ms. Cerano voluntarily turned herself in. She was sentenced on March 9, 2022. **Exhibit 1,** judgment. Ms. Cerano is currently housed at FMC Carswell in Fort Wort, Texas. During her stay undersigned counsel has sent several letters, CMRRR, to the prison warning of her poor health condition. Ms. Cerano has a severe open wound which has been neglected despite repeated requests and notification. See **Exhibits 5, 6, 7, and 8.** She has to sleep face down and cannot sit in a chair but for a short while due to the pain.

Ms. Cerano has been cooperative and a witness who visited her recently reported on her observed condition. **Exhibit 2**, containing medical information filed under seal.

Most recently undersigned counsel has sent requests to Ms. Cerano's BOP counselor requesting her medical records for December 1, 2022, to the present and asking to talk to Ms. Cerano about her urgent medical and legal needs, including further consultation for this instant filing, but has been ignored and in one instance given a nonsensical reason for refusing to provide medical records. **Exhibit 3.**

Ms. Cerano was in a "quarantine" for at least 18 days with three other prisoners when that is improper process for quarantine. While she was seen May 19 and 20th of 2022 proper care was not administered and she had to clean her wounds herself with menstrual pads in front of other prisoners.

June 3rd, 2022, Ms. Cerano was sent to a hospital unit but they did not follow instructions and put her in the regular unit in floor two of the jail. Ms. Cerano still had the open wound and severe infection with leakage and no elevator pass to go to medical. Despite the Hon. Lynn N. Hughes stating Ms. Cerano would receive proper medical which would have been a hospital that did not occur and, furthermore, there was no quarantine.

After Ms. Cerano's surgery she has constantly had infections for over a year and has been taking antibiotics. About two months prior to filing this motion staff told Ms. Cerano that there was nothing they could do until Ms. Cerano has another surgery and informed her the surgery may cause severe nerve damage and greatly affect her mobility. Instead of keeping her in the hospital staff sent her back to a regular cell area and Ms. Cerano is still relegated to using feminine hygiene products to clean herself in front of prisoners with an open wound, leakage, and severe infection. Several medical care providers apparently do not possess the proper credentials and licensing to be treating Ms. Cerano for her condition. Ms. Cerano needs a specialist that Carswell or the BOP cannot or will not provide.

Ms. Cerano has repeatedly gone to sick call to ask for help and staff ignores her wound or check her status and just gives her common antibiotics without checking her condition. She is repeatedly not taken to appointments despite her needing and cooperating in care. Any statement that Ms. Cerano has refused care is not correct.

Three inmates have died recently at Carswell due to bad medical care and negligence, likely amounting to deliberate indifference. It does not appear Carswell has the staff to adequately take care of the inmates including Ms. Cerano. She needs a surgery to separate her nerves and without competent proper medical staff there is a real danger of being paralyzed or even death.

Additionally, Ms. Cerano attaches her recent statement. **Exhibit 4.**

Ms. Cerano has sent many warnings and communications. See **Exhibits 5, 6, 7, and 8,** letters of October 16, 2022, November 18, 2022, February 2, 2023, and May 18, 2023, but as of yet she is in grave danger of further injury and death.

Due to her condition and treatment a claim has been made to the BOP. **Exhibits 9 and 10,** November 23, 2023, letter to BOP and acknowledgement.

Regarding her BOP medical care a registered nurse has reviewed her medical records and notes that (medical records proving these facts and more can be obtained through the BOP or can be provided by movant upon request):

- *5/19/2022 Ms. Cerano was seen by the FNP-C who ordered wound care 3x's a week for 90 days to the right gluteal area. This was an initial assessment on transfer to the facility.*
- *5/20/2022 Physical therapy documented wound care services were not indicated due to the inability of the gluteal wound to heal without surgical closure and there was a visible implant in the right gluteal area. The patient was discharged from physical therapy wound care.*
- *6/3/2022 Ms. Cerano is taken to the ER for her wound and discharged.*
- *6/14/2022 Surgery is scheduled for wound closure and implant removal on 6/21/2022. The wound is worsening. The patient was brought to the ER for a wound check. The physician documents "They do not recommend additional*

*admission at this time. They are scheduling her for outpatient surgery sometime next week."*

- *6/19/2022 It is noted by the RN the patient is not on the med trip list for 6/21/2022 (Ms. Cerano's scheduled surgery date).*
- *6/21/2022 Patient missed scheduled surgery because it wasn't communicated to Carswell's staff. Noted an attempt to reschedule ASAP, but never a documented reschedule date.*
- *6/27/2022 Patient taken back to ER where Dr. Sweeney documents, " patient has right buttock implant that was placed 3 years ago. It has healed but she got a wound on her bottom one month ago and it started to get larger. She has been here twice this month for pain associated with this. Prison did not take her to her surgery follow-up appointment. CT scans both times she was here this month. I do not feel comfortable discharging this patient and she will be admitted."*
- *6/29/2022 Patient has surgery on right buttock with implant removed and Wound VAC placed.*
- *7/01/2022 Patient discharged with the need for Wound VAC at the prison. The prison states the equipment is there and the patient is transported with just a dressing and an order for the Wound VAC to be placed within 2 hours (this is a negative pressure dressing) of arrival. On arrival, the prison does not have the equipment, and the patient is sent back to the hospital.*
- *12-29/2022 The wound is still not healing. Jason Miller DO documents "There are still signs of infection in the wound, despite being on antibiotics. The wound is deeper and tunneling slightly." "She has been on 5 different antibiotics without full resolution of the infection and wound."*

*…It appears that Ms. Cerano waited approximately 41 days while incarcerated with an open wound with an implant showing before she was allowed surgery to correct it. She was given antibiotics and a dressing in the interim. The facility was aware that she needed a surgical consult from the wound care expert's (physical therapy) documented initial evaluation. Ms. Cerana was forced to miss her June 21, 2022, surgery because of miscommunication within the facility.  She finally received surgery on 6/29/2022, after the ER physician was uncomfortable discharging her because the wound had become so severe. This type of delay in care would likely not occur with an ordinary patient. An open wound with a visible implant and infection is considered urgent if not emergent. The patient was still suffering from an unhealed wound 6 months after her surgery and now suffers from nerve pain. She has been given many antibiotics as well.*

Note that the registered nurse wanted Ms. Cerano's most recent medical records, however, BOP will not provide them. **Exhibit 3.** That Ms. Cerano's most recent medical records have been requested yet there has been a refusal to provide them is indicative of more malpractice or deliberate indifference.

It is believed that several BOP healthcare providers may not have the proper licensing and certifications for the services they are performing including nurse Tammy Nodland, Robinson Brown MD, in OBGYN, and Doctor Miller MD in orthopedics and potentially others.

Compassionate release is warranted due to her severe wounds and extreme lack of care by the BOP and requirement of continued care, as well as Covid-19 dangers. Due to her condition Maribel Santana-Cerano falls in the "high risk" category for experiencing serious or life threatening complications if she contracts COVID-19. Therefore, in accordance with the Attorney General's instructive memoranda, Maribel should be granted compassionate release immediately.

Note that recent amendments have passed under 18 U.S.C. Section 3582(c)(1)(A)(C) which include that risk of serious deterioration in health or death, that is not being provided in a timely or adequate manner by the Bureau of Prisons:

> (C) The defendant is suffering from a medical condition that requires longterm or specialized medical care, without which the defendant is at risk of serious deterioration in health or death, that is not being provided in a timely or adequate manner.
>
> (D) The defendant presents the following circumstances—

> (i) The defendant is housed at a correctional facility affected or at risk of being affected by (I) and ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
> (ii) The defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described is clause (i); and
> (iii) Such risk cannot be mitigated on a timely or adequate manner.

II. Concerns among Government officials increased rapidly as the COVID-19 threat became a pandemic

As COVID-19 began claiming the lives of many Americans, and the physicians predicted the exponential growth of those numbers, government officials became increasingly concerned for inmates due to the close proximity within the units, the inability to self-isolate and inability to protect those who have underlying health conditions that put them at high risk for experiencing severe complications from contracting the virus, including death.

On March 23, 2020, a bi-partisan letter to the Justice Department from 14 members of the United States Senate, expressed "serious concern for the health and well-being [sic] of federal prison staff and inmates in Federal custody, especially those who are most vulnerable to infection…" and they strongly urged the DOJ to take all necessary steps to protect them.

Soon thereafter, the Attorney General of the United States released his original memo to the Bureau of Prisons on March 26, 2020, instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic. See Memorandum from the Attorney General to the Director of Prisons dated March 26, 2020.

Closely following the AG memo, on April 1, 2020, the Federal Public & Community Defenders wrote an urgent letter to Attorney General Barr arguing:

> There is no constitutional or statutory authority for DOJ to play roulette with people's lives because of their offense of conviction. Imprisonment is meant to punish by restricting liberty, not by exposure to illness.

--Letter to Attorney General William Barr from Federal Public & Community Defenders.

Since then, AG Barr released a more strongly written directive calling for hasten release of vulnerable inmates from federal prisons. In an April 3, 2020, memorandum to the Director of the Bureau of Prisons, declaring emergency conditions exist in the Bureau of Prisons, Attorney General Barr said:

> We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. …[Y]ou should include [the review for release of] all at-risk inmates— not only those who were previously eligible for transfer. For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then

8

> immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. …I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety. Given the speed with which this disease has spread through the general public, it is clear that time is of the essences. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

See April 3, 2020, Memorandum.

II. When considering the totality of the circumstances, Maribel meets the discretionary factors set by Attorney General Barr in the March 26, 2020, Memo

The Attorney General gave a non-exhaustive list of discretionary factors to consider when evaluating the totality of the circumstances for each inmate requesting release to home confinement. The factors are:

1. The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

2. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

3. The inmate's conduct in prison, with inmates who have engaged in violent or gang related activity in prison or have incurred a BOP violation within the last year not receiving priority treatment;

    4.      The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment;

    5.      Whether the inmate has demonstrated a verifiable reentry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would fact in his or her BOP facility; and

    6.      The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

See Memorandum from the Attorney General to the Director of Prisons dated March 26, 2020.

        The Attorney General also instructed that an assessment of the inmate's risk factors for severe COVID-19 must be considered along with risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. See id.

    A.  Ms. Cerano's medical history places her in the most vulnerable group in accordance with CDC guidelines

      According to the CDC, people with infections may be at a higher risk of getting very sick from COVID-19. Ms. Cerano's medical history of infection and

wounds places her in the most vulnerable group for susceptibility to serious complications from COVID-19.

If she is not released from the facility the virus and her underlying medical issues, put her at risk of contracting the disease and suffering serious health complications. Contracting the coronavirus in prison might be a death sentence for Ms. Cerano. As the Federal Public Defenders urgently pleaded, "[t]here is no constitutional or statutory authority for DOJ to play roulette with people's lives because of their offense of conviction. Imprisonment is meant to punish by restricting liberty, not by exposure to illness." See Letter to Attorney General William Barr from Federal Public & Community Defenders.

Ms. Cerano's unit had many positive cases of COVID-19. This places extreme urgency to protect Ms. Cerano from potential harm.

B. FCI Carswell meets the facility requirements of Attorney General Barr's Memo

The second factor to consider is the security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities. FCI Carswell is a low to medium security federal correctional institution. Further, many cases of COVID-19 has been diagnosed for personal at FCI Carswell, which increases the risk of inmates contracting the virus.

11

C.     Ms. Cerano has had exemplary conduct while in prison, has a low PATTERN score, and can adopt a re-entry plan which will reduce the possibility of recidivism.

D.     Ms. Cerano, if released, would stay with her daughter Amy Cerano at 16222 Clay Road, apt. 613, Houston, Texas 77084, 346-714-8836, and she would pay for her lodging. Because of her condition she could not work until she had her surgery and her wounds healed. She could get coverage under the Affordable Care Act as they cover preexisting conditions and her income would be low enough to get the coverage for no charge. The BOP could also arrange for coverage in the free world. Ms. Cerano could get treatment at Methodist Hospital or Memorial Hermann.

## **CONCLUSION**

Compassionate release is appropriate for Maribel Santana Cerano. She is a nonviolent offender suffering from a severe untreated wound infection which has been and is being neglected. Further, the medical history places her at a very high risk of having complications from COVID-19. If she is not released from the facility, the virus and her past and present medical issues put her at a high risk of death or severe injury including paralysis. The past failures of the BOP have caused her immense suffering and pain and potential life-long disfigurement, paralysis, and death. Covid-19 is still active and contracting COVID-19 in prison could be a death sentence for Ms. Cerano.

Maribel Santana Cerano, in the interest of justice and fairness and compassion, should be released.

Respectfully submitted,

*/s/ Randall L. Kallinen*
Randall L. Kallinen
KALLINEN LAW PLLC
State Bar of Texas No. 00790995
U.S. So. Dist. of TX Bar No. 19417
511 Broadway Street
Houston, Texas 77012
Telephone:   713/320-3785
Fax:              713/893-6737
Email:          AttorneyKallinen@aol.com

Alexander C. Johnson
KALLINEN LAW PLLC
State Bar of Texas No. 24123583
U.S. So. Dist. of TX No. 3679181
511 Broadway Street
Houston, Texas 77012
Telephone:   573/340-3316
Fax:              713/893-6737
Email:          alex@acj.legal

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that on September 6, 2023, I have served a true and correct copy of the foregoing document that was delivered by the ECF in accordance with the Federal Rules of Criminal Procedure to all ECF notice attorneys of record and on September 5, 2023, I sent a draft of this motion to the Warden of the BOP Carswell Unit.

*/s/ Randall L. Kallinen*
Randall L. Kallinen

13

## CERTIFICATE OF CONFERENCE

I certify that I have conferred in good faith by emailing the Warden of the Carswell Unit the contents of this motion September 5, 2023, and by emails and telephone calls to DOJ attorney Steven Schammel.

*/s/ Randall L. Kallinen*
Randall L. Kallinen