Hospice Volunteer Training

Want to Help Those in Need

Apply to be a Volunteer with the Hospice Program at FMC Carswell. The Hospice Program provides care and support to terminal patients with the help of inmate volunteers. Help make a difference by volunteering your time and support. If you would like more information, please submit an electronic cop-out to Ms. Little in the Social Work Department.

How to Apply

If you would like to be a member of the hospice team, obtain an application from the Social Work Department and submit it by October 30, 2023.

Rules and Requirements

Volunteers must have a year of clear conduct, at least a year remaining at FMC Carswell and be willing to complete the 30-hour mandatory training.

* Volunteer training will be held Fall of 2023

# Federal Medical Center Carswell
## Hospice and Palliative Care Program
## Volunteer Application

*Please answer every question below. You must print clearly as your application will not be considered if illegible.*

| NAME | | REG. NO. | PROJECTED RELEASE DATE |
|---|---|---|---|
| | | | |

| WORK DETAIL | SUPERVISOR NAME | OFFENSE |
|---|---|---|
| | | |

| HOW LONG HAVE YOU BEEN INCARCERATED? | LENGTH AT CARSWELL? | ARE YOU NOW OR PLAN TO BE A SUICIDE WATCH CAMPANION? |
|---|---|---|
| | | ○ YES     ○ NO |

**HIGHEST LEVEL OF EDUCATION (CHECK ONE)**

○ COLLEGE     ○ HIGH SCHOOL     ○ GED     ○ CURRENTLY ENROLLED IN GED     ○ NONE

**DO YOU HAVE ANY INCIDENT REPORTS ON RECORD? (IF YES, LIST BELOW)**
○ YES     ○ NO

| DATE | CODE | OFFENSE |
|---|---|---|
| | | |
| | | |
| | | |

**DO YOU HAVE ANY SIGNIFICANT MEDICAL OR MENTAL HEALTH CONDITIONS (IF YES, EXPLAIN BELOW)**
○ YES     ○ NO

**HOW WOULD YOU DESCRIBE YOUR PERSONALITY?**

**HOW DO YOU THINK YOUR WORK SUPERVISOR WOULD DESCRIBE YOU?**

**WHEN FEELING STRESSED OR OVERWHELMED, HOW DO YOU COPE?**

(over)

FROM: Legal, Lisa
TO: 46263509
SUBJECT: NPR Newsflash! BOP Healthcare Driven by 'Delay and Ignore'   LISA Newsletter for September 25, 2023
DATE: 09/25/2023 08:40:31 AM

LISA publishes a free newsletter sent every Monday to inmate subscribers in the Federal system.

Edited by Thomas L. Root, MA, JD

Vol. 9, No. 39

<><>

NPR Blasts Substandard BOP Healthcare
6TH Circuit Refuses En Banc On Stacked 924(C) Sentences
Preview of Coming Events
$117 A Day Won't Buy You Performance

<><>

NPR BLASTS SUBSTANDARD BOP HEALTHCARE

In a report that won't shock a single Bureau of Prisons inmate, NPR reported this past weekend that the BOP has misrepresented the accreditation of its healthcare facilities while compiling a record of ignoring or delaying medical treatment especially in cancer care   leading to needless inmate disability and death.

NPR said it had obtained hundreds of BOP records that showed, among other things, that over 25% of the almost 5,000 inmates who died in federal custody from 2009 to 2020 died in a single place: FCC Butner. According to NPR's analysis, more BOP prisoners died of cancer than any other cause from 2009 to 2020.

More deaths at Butner are to be expected, given the complex includes FMC Butner, the system's largest cancer treatment facility. However, NPR reported, it found

"numerous accounts of inmates nationwide going without needed medical care. More than a dozen waited months or even years for treatment, including inmates with obviously concerning symptoms: unexplained bleeding, a suspicious lump, intense pain. Many suffered serious consequences. Some did not survive. Too often, sources told NPR, federal prisons fail to treat serious illnesses fast enough. When an ailment like cancer is caught, the BOP often funnels these sick inmates to a place like Butner, where it is assumed they'll receive more specialized treatment. But by the time prisoners access more advanced care, it's sometimes too late to do much more than palliative care. What's more, current and former inmates and staff at Butner told NPR the prison has issues of its own, including delays in care and staffing shortages."

NPR caught the BOP in a falsehood. The agency says on its website that "Federal Medical Centers (FMCs) are accredited by the Joint Commission," the nation's leading healthcare accreditation agency. But NPR found that was untrue. BOP's certification lapsed two years ago.

Sources NPR interviewed said federal inmates are dying more often than they should. "Deaths in custody should be rare events, given that this is such a controlled environment," says Michele Deitch, director of the University of Texas at Austin's Prison and Jail Innovation Lab. "Are there preventable deaths happening in the BOP? The answer to that is clearly yes."

NPR quoted an anonymous BOP medical staff member at Butner who said she has heard stories like theirs "so many times  So many inmates have told me, 'I complained about this lump, or I complained about this pain for so long, and they only gave me cream, they only gave me Motrin, they never sent me out for tests or anything. Now they send me here and I have Stage 3 or Stage 4 cancer. Our question is always: What took them so long to get to us, and why did they send them to us when there's nothing that we can do?"

Art Beeler, a former Butner warden, told NPR it was hard to see inmates arrive at the FMC with late-stage cancer. "There were cases we received late, and every one of them was frustrating," Beeler said. "If we received someone who had Stage 4 prostate cancer, who showed indicators early on in the process, we were very frustrated... We knew more than likely the patient would live if they had received treatment early on."

In March 2022, the Dept of Justice Inspector General audit of the BOP's contract with a medical service contractor at Butner. found the BOP "did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."

The IG report also noted "challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare." The contractor told the Inspector General that their staff spent a "significant amount of time" canceling and rescheduling inmate appointments."

"We believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard," the report noted.

Delshon Harding, president of the union local representing Butner officers, told NPR he believes staff shortages are the primary reason inmates go without essential care.

A report issued last week by three federal agencies including DOJ found that as of March 2022, 89% of all BOP facilities had one or more clinical position vacancies. Thirteen prisons lacked any staff medical officer. Only 69% of BOP medical officer positions were filled.

NPR, 1 in 4 inmate deaths happens in the same federal prison. Why? (Sep 23)

BOP, Medical Care (last visited Sep 23)

Dept of Justice, Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School (Mar 2022)

Veterans Administration, Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic (Sep 21)
<><>

6TH CIRCUIT REFUSES EN BANC ON STACKED 924(C) SENTENCES

Pavlo complains that perhaps thousands of other prisoners "who were sentenced and have months of time in transit getting to their final designated facility are currently not getting those credits." Pavlo notes that "prisoners who have a disagreement with the BOP have access to an administrative remedy process to air their grievances. However, those in the chain of command at the BOP who would review those grievances have no authority within the BOP to award these credits as it deviates from the BOP's own Program Statement, which remains unchanged... Currently, the only solution is for every prisoner who has this situation is to exhaust the administrative remedy process, something that could take 6-9 months, and go to court to find a judge who agrees with [Patel v Barron]"

Not necessarily.. A Hawaii court in Huihui v Derr Court excused exhaustion because "further pursuit would be a futile gesture because there is an error in [the BOPs] understanding of when Petitioner can begin earning credits under 18 USC 3632(d)(4)(B) and 3632(a) [A]ny further administrative review would not preclude the need for judicial review."

Forbes, Bureau of Prisons' Dilemma On First Step Act Credits (Oct 27)

Patel v Barron, Case No C23-937, 2023 USDist LEXIS 174601 (WD Wash. Sept 28, 2023)

Huihui v Derr, Case No 22-00541, 2023 USDist LEXIS 106532 (D Hawaii, June 20, 2023)

Yufenyuy v Warden FCI Berlin, No. 22-CV-443, 2023 USDist LEXIS 40186 (D NH, Mar 7, 2023)
<><>

## CARSWELL MEDICAL CARE ON TRIAL IN SOUTH FLORIDA HEARING

A woman whose federal sentence last April came with a promise by a BOP medical official that he'd personally see that she would receive the care she needed to treat her life-threatening seizure condition was back in court was back in court after only eight weeks in FMC Carswell, due to her attorney's concern that "the BOP has proven unable to manage or prevent these life-threatening episodes."

Sarah Kersey suffers from severe, stress-induced seizures. She went into cardiac arrest on the floor of the courtroom last year when she was convicted. When she was sentenced, her lawyer warned that sending her to prison could kill her.

At sentencing, the Court found that there was "no doubt" that Sarah "does suffer from a serious health condition, in fact perhaps a number of health conditions," that she was "medically frail," and that "she will require much medical care." But despite her undisputed seizure disorder and other medical ailments, the Court relied on testimony from the FMC Carswell Medical Director that the BOP could "provide Ms. Kersey with whatever medical care she needs."

Sarah self-surrendered in mid-July. Only two months later, her attorney told the court that Sarah "has required emergency outside hospitalization on at least two separate occasions. Specifically, counsel has been advised that Mrs. Kersey has suffered ongoing, repeated seizures including two major episodes with the latest episode involving cardiac arrest. (It has also resulted in blood clots that are now not being monitored)" The BOP's "repeated failure is contrary to the picture painted by the government at sentencing. Counsel has also been advised fellow inmates have been forced to attempt life-saving care during these seizures because prison officials failed to do so."

BOP medical official Mark Holbrook told the judge in April that the BOP could care for Sarah. But five months later, her heart and lungs briefly stopped working on the floor of a friend's cell. Inmates screamed at the guards to call for help. "Granny's eyes were wide open, but you could see that the light was no longer there," wrote one of two incarcerated women who performed CPR on Sarah until medics arrived. "She was gone."

"That was my mistake," Dr. Holbrook admitted to the judge at last month's hearing.

"He made several promises and several assurances. It appears none of which occurred," Sarah's attorney told the judge, the Palm Beach Post reported, "Letters from half a dozen inmates and the testimony of Carswell's own medical director depict a standard of care unlike the one Holbrook promised. One where Kersey must depend on her fellow inmates to keep her heart beating, and doubts over the legitimacy of her seizures dampen what care she does receive."

Maitee Serrano-Mercado, FMC Carswell's clinical director, testified that she was never contacted by Holbrook and prison staff only belatedly learned that Sarah had a history of seizures.

The Post noted that Carswell, dubbed by the Fort Worth Weekly in 2005 as a "hospital of horrors," is "the only federal medical

...acility for incarcerated women in the country. It lost its accreditation during the pandemic and has not gotten it back.

...errano-Mercado said at the hearing that Sarah's seizures might not be real, but she admitted that a Carswell inmate who died ...August had been sent there because she needed medical treatment for epileptic seizures that the Carswell staff said were ...ked, too.

...arah told the Post in an email that the treatment of women at Carswell was "nothing short of torture People come in here ...alking and leave in wheelchairs. People die here," she wrote. "I don't want to be one of them."

...alm Beach Post, 'Inexcusable': Attorney blasts federal prison officials over Boca woman's medical care (Oct 27)

...otion for Hearing (ECF 200), US v Kaye, Case No 9:21-cr-80039 (SD FL, Sept 12, 2023)
><>

...e LISA Newsletter is copyright 2023, LISA Foundation, PO Box 636, Norwalk OH 44857.

...or privacy, we use pseudonyms for people who are still incarcerated.

...our family may read our newsletter online at www.lisa-legalinfo.com. If you want to receive the newsletter, send a Corrlinks ...vitation to newsletter@lisa-legalinfo.com.

...you have a question, please send a new email to newsletter@lisa-legalinfo.com.

She surrendered her nursing license and lost custody of her children.

"I think it would have been OK if she had not been incarcerated and had simply surrendered her nursing license," Steve Rider said. "The person wasn't harmed. They just missed a dose of the painkiller.

Rider's attorney argued at the sentencing hearing that his client should be sentenced to 13 months — a lifetime for a mother of young kids, but a fair punishment for what she'd done, he said.

Instead, Hillman sentenced Rider to three years in prison and recommended she participate in psychological care.

"Ms. Rider, I know this is not a good day, and nobody here takes any pleasure in what's going on," Hillman said. "I can only wish you the best, and hopefully this is a beginning; and it sounds like you've got a good start on it, so good luck."

## ALLEGATIONS OF ABUSE

Gwen Rider was initially incarcerated on the East Coast near her family. But when she was diagnosed with epilepsy, the Bureau of Prisons sent her to Carswell.

At Carswell, Gwen Rider was able to see a psychologist at the facility that she spoke very highly of, Steve Rider said. She was working through further trauma from her time at a prison in Rhode Island, where Steve Rider said she was physically abused by a staff member.

But a medical professional at the facility "was very abusive to Gwen," he said.

"The doctor kept insisting her seizures were fake even though she had a work-up and it showed it," Steve Rider said. "There are people who feel that this doctor drove Gwen to suicide."

Steve Rider said he isn't sure if he can endorse that idea. "Each person is responsible for what they do," he said. But he remembers many conversations about the woman treating his daughter's epilepsy and said she was "clearly incompetent."

Carswell has a history of alleged medical neglect. In 2020, 70 women at the prison filed a lawsuit, alleging abusive treatment during COVID lockdown. In October 2020, Cynthia Baxter died two weeks after being released from Carswell. Baxter had cancer and did not receive needed treatment from the prison, people incarcerated at the facility said.

In April 2021, 62-year-old Martha Evanoff died after begging for medical attention for months and being denied help, women at the prison said. In June 2021, 54-year-old Sherri Hillman, who was still awaiting a sentencing hearing, died at Carswell after being transferred there to receive medical care; one woman said she screamed for help for days but staff ignored her.

## NOT PLACED ON SUICIDE WATCH

Five women incarcerated at the prison with Gwen Rider said she had attempted to die by suicide several times but was not on suicide watch at the time of her death.

According to the BOP's suicide prevention policy, a person who is suicidal will receive appropriate preventive supervision and other treatment. If a person is suicidal, they should be placed on suicide watch and only removed when they are no longer at imminent risk for suicide.

But women at the prison say staff did not follow those procedures.

Staff and some of the women incarcerated at the facility picked on Gwen Rider because of her seizures and because she grinded her teeth at night, said Faith Blake, who was in the same unit as Gwen Rider.

Alicia Elliot, who is incarcerated at Carswell, said Gwen Rider was placed in suicide watch for a few days and then released into general population. Merrideth Horton, who was incarcerated at Carswell until January, said it was common for people who needed mental health attention to not receive the help they needed.

According to Shannon Richardson, who is also incarcerated at Carswell, Gwen Rider told a lieutenant that when she got off suicide watch, "that one way or the other she was going to succeed."

Richardson said that should have prompted staff to keep Gwen Rider on the mental health unit.

"Instead she was thrown right back into (general population) with hundreds of women and no close supervision," Richardson said.

The Bureau of Prisons did not answer the Star-Telegram's questions about why Gwen Rider was released back into general population and if the program coordinator first performed a face-to-face evaluation, which is required under the BOP's suicide prevention policy.

"I don't want her to be only (remembered for) that she ended her own life," Blake said. "Her kids have to know that they were big time loved."

'I WAS VERY PROUD OF HER'

Gwen Rider called her dad and son nearly every day while in prison, Steve Rider said, and he had "never known another who loved her children more than her   it was exceptional.

"I was very proud of her and very proud to call her my daughter," he said.

Steve Rider, 75, and his husband are adopting Gwen Rider's children. He has now lost two children to suicide.

Research shows that incarceration worsens existing mental health conditions. In state and federal prisons, a total of 4,500 people died by suicide from 2001 to 2019., according to a U.S. Bureau of Justice Statistics report in 2021. The number of suicides increased 83% over that period.

"I'm looking forward to putting all this behind me," Steve Rider said. "I am very good at forgetting bad things."

FROM: Trujilo Solano, Jesus
TO: 37899509
SUBJECT: Noticia
DATE: 09/11/2023 01:21:02 AM

Gwen Rider was known to show off pictures of her two kids to anyone who would listen at the federal prison she was incarcerated at in Fort Worth.

She loved to brag about her 11-year-old son and his computer programming skills and her 1-year-old daughter, with her big blue eyes.

Her children were the main focus of the speech Rider gave before the judge during her sentencing hearing in January.

They remain my greatest pride and joy," the 44-year-old told Judge Timothy Hillman in a Massachusetts courtroom. "And I hope to be reunited with them as soon as possible."

In the sentencing hearing, Rider and her attorney talked about her struggles with PTSD, autism and substance use. Hillman said during the hearing that Rider's case "might be the saddest story I think I've ever heard." He sentenced her to three years in prison.

In 2022, Rider was diagnosed with epilepsy. To receive appropriate treatment, the Bureau of Prisons transferred her in March 2023 to FMC Carswell, the only federal medical facility for incarcerated women in the country.

Five months later on Aug. 3, Rider died by suicide at FMC Carswell.

While the Bureau of Prisons sent Rider to Carswell specifically for medical treatment, women incarcerated at the prison say she did not receive the psychological or medical treatment she needed.

Her father, Steve Rider, said a doctor at the facility told her that her epileptic seizures were not real.

"If she had been given proper medical care and there had not been this argument about epilepsy and the fact that she needed to be protected from it, probably she would be still alive," Steve Rider said.

## SENTENCED TO PRISON AFTER SUICIDE ATTEMPT

Gwen Rider was an very intelligent child with an excellent memory, her father said. She dealt with mental health issues throughout her life, he said. She had trauma and PTSD after being molested in a Catholic school, and she was the one who found her brother's body when he died by suicide.

Still, she had a soft heart. She was extremely empathetic and befriended everyone, Steve Rider said. She once saw a dog running around on a busy street and she immediately pulled over, rescued the dog and adopted it as her own.

She studied to become a nurse and developed "an encyclopedic knowledge of medicine," her father said.

In 2020, Rider worked at a nursing home in Massachusetts. On Nov. 6, 2020, she was overseeing a unit specializing in care for residents with dementia. It was the height of the COVID-19 pandemic, and Rider was having legal issues with her son's school, according to court records from her sentencing hearing.

Nov. 6 also happened to be the anniversary of her brother's suicide, whose death she had always felt somewhat responsible for, according to her father.

As she cared for a patient who was nonverbal and received morphine for pain, Rider removed about 70% of the morphine from the bottle and replaced it with water.

She planned to use the morphine to die by suicide.

Rider did not go through with her plan; she said during her sentencing hearing she worried what would happen to her son. When another nurse noticed the missing morphine, Rider was charged with tampering with a consumer product and obtaining a controlled substance by fraud and deception.

threatening episodes."

Sarah Kersey suffers from severe, stress-induced seizures. She went into cardiac arrest on the floor of the courtroom last year when she was convicted. When she was sentenced, her lawyer warned that sending her to prison could kill her.

At sentencing, the Court found that there was "no doubt" that Sarah "does suffer from a serious health condition, in fact perhaps a number of health conditions," that she was "medically frail," and that "she will require much medical care." But despite her undisputed seizure disorder and other medical ailments, the Court relied on testimony from the FMC Carswell Medical Director that the BOP could "provide Ms. Kersey with whatever medical care she needs."

Sarah self-surrendered in mid-July. Only two months later, her attorney told the court that Sarah "has required emergency outside hospitalization on at least two separate occasions. Specifically, counsel has been advised that Mrs. Kersey has suffered ongoing, repeated seizures including two major episodes with the latest episode involving cardiac arrest. (It has also resulted in blood clots that are now not being monitored)." The BOP's "repeated failure is contrary to the picture painted by the government at sentencing. Counsel has also been advised fellow inmates have been forced to attempt life-saving care during these seizures because prison officials failed to do so."

BOP medical official Mark Holbrook told the judge in April that the BOP could care for Sarah. But five months later, her heart and lungs briefly stopped working on the floor of a friend's cell. Inmates screamed at the guards to call for help. "Granny's eyes were wide open, but you could see that the light was no longer there," wrote one of two incarcerated women who performed CPR on Sarah until medics arrived. "She was gone."

"That was my mistake," Dr. Holbrook admitted to the judge at last month's hearing.

"He made several promises and several assurances. It appears none of which occurred," Sarah's attorney told the judge, the Palm Beach Post reported, "Letters from half a dozen inmates and the testimony of Carswell's own medical director depict a standard of care unlike the one Holbrook promised. One where Kersey must depend on her fellow inmates to keep her heart beating, and doubts over the legitimacy of her seizures dampen what care she does receive."

Maitee Serrano-Mercado, FMC Carswell's clinical director, testified that she was never contacted by Holbrook and prison staff only belatedly learned that Sarah had a history of seizures.

The Post noted that Carswell, dubbed by the Fort Worth Weekly in 2005 as a "hospital of horrors," is "the only federal medical facility for incarcerated women in the country. It lost its accreditation during the pandemic and has not gotten it back.

Serrano-Mercado said at the hearing that Sarah's seizures might not be real, but she admitted that a Carswell inmate who died in August had been sent there because she needed medical treatment for epileptic seizures that the Carswell staff said were faked, too.

Sarah told the Post in an email that the treatment of women at Carswell was "nothing short of torture. People come in here walking and leave in wheelchairs. People die here," she wrote. "I don't want to be one of them."

Palm Beach Post, 'Inexcusable': Attorney blasts federal prison officials over Boca woman's medical care (Oct 27)

Motion for Hearing (ECF 200), US v Kaye, Case No 9:21-cr-80039 (SD FL, Sept 12, 2023)
<><>

The LISA Newsletter is copyright 2023, LISA Foundation, PO Box 636, Norwalk OH 44857.

For privacy, we use pseudonyms for people who are still incarcerated.

Your family may read our newsletter online at www.lisa-legalinfo.com. If you want to receive the newsletter, send a Corrlinks invitation to newsletter@lisa-legalinfo.com.

If you have a question, please send a new email to newsletter@lisa-legalinfo.com.

Tuesday, March 21, 2023

Sharmistha Barai - #76033-097
P.O. Box 27137
Fort Worth, TX 76127

Regarding: Bureau of Prisons - FMC Carswell
Incident #04161QZJ-34285JOH

We are writing in response to the concerns you shared with The Joint Commission.

We have reviewed our records and determined that the organization listed above is not currently accredited by The Joint Commission. Therefore, we have no authority to evaluate the information you reported.

Thank you for bringing your concerns to our attention. We encourage you to contact the organization directly for resolution. You may also want to contact the State Department of Health to see if they can address your concern(s).

Sincerely,

Office of Quality and Patient Safety

**Headquarters**
One Renaissance Boulevard
Oakbrook Terrace, IL 60181
630 792 5000 Voice

FROM: Gilna, Derek
TO: 31341047
SUBJECT: Federal Legal News 8-28-23
DATE: 08/28/2023 01:51:13 PM

United States Sentencing Commission (USSC) Approves Retroactivity; Don't Fall for The Bureau's Newest Second Chance Act (SCA) Scam; Bureau Continues Misinformation Campaign on Second Chance Act and FSA Credits For Non-Citizens; Favorable Court Decision On Drug-Quantity Sentencing Presumptions; As Federal Prison Facilities Deteriorate, Will Congress take Action on Decaying Federal Prisons?

By Derek Gilna, Director of Research

This past week the USSC voted to approve retroactivity on all of the recent, positive Guidelines changes, opening the door to a sentencing court's reconsideration -and reduction- of a previously imposed sentence: "The Commission, by a majority vote, allowed for retroactive application of Amendment 821 relating to criminal history meaning that certain currently incarcerated individuals could be eligible for reduced sentences made effective beginning on February 1, 2024. The Commission also adopted its next set of policy priorities that include, among other things, reviewing and potentially amending how the guidelines treat acquitted conduct for purposes of sentencing as well as assessing the degree to which certain Bureau of Prisons practices are effective in meeting the purposes of sentencing."

Let that second sentence sink in. In plain English, immense pressure from Congress, advocates, and prisoners' families, not to mention numerous Inspector General Reports detailing Bureau incompetence and malfeasance, means that the era of Bureau denial, disinformation, and deception may soon draw to a close. Judges will be obligated to carefully consider well-made arguments about deficient prisoner operations, especially those affecting health and safety, in post-conviction motions for sentence relief.

The Commission continued: "Equipped with a quorum of commissioners the Commission voted in April to promulgate amendments to the federal sentencing guidelines including Amendment 821 providing for targeted, evidence-based changes to certain criminal history rules. Because two parts of that amendment reduce the sentencing range of future defendants, the Commission is required by law to consider whether judges can extend those reductions to previously sentenced individuals "

As a result of this action, Part A of Amendment 821 now limits the overall criminal history impact of "Status Points" at §4A1.1. Part B, Subpart 1 of Amendment 821 creates a new Chapter Four guideline at §4C1.1 decreasing by two the offense levels for defendants who did not receive any criminal history points and whose instant offense did not involve specific aggravating factors. "These prospective changes to the criminal history rules made by the Commission in April reflect evidence-based policy determinations that apply with equal force to previously sentenced individuals. Applying these changes retroactively will increase fairness in sentencing. At the same time, the 3-month delay will help ensure that individuals released based on our decision today receive the benefit of reentry programs and transitional services essential to support their successful reentry to society, which at the same time promotes public safety." We can assist with this process.

Commission statistics project that, "11,495 incarcerated individuals will have a lower sentencing range under Part A of Amendment 821 relating to "Status Points" with a possible sentence reduction of 11.7%, on average, and 7,272 incarcerated individuals would be eligible for a lower sentencing range based upon the established criteria under Part B of Amendment 821 relating to 'Zero-Point Offenders' with a possible sentence reduction of 17.6%, on average."

We can assist with this process also.

Now to NEXT year's new USSC priorities, which are even more helpful in gaining sentence relief: " the Commission will work to assess the degree to which certain practices of the Bureau of Prisons are effective in meeting the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2). (It)will also compile and disseminate information on court-sponsored programs relating to diversion, alternatives-to-incarceration, and reentry.

"The Commission will also review and potentially amend how the guidelines treat acquitted conduct for purposes of sentencing. The Supreme Court recently denied several petitions for writs of certiorari related to the use of acquitted conduct. In issuing the denials, three Justices supported the denial to allow the Commission more time to address the issue. Last year's amendment cycle was busy and abbreviated. The Commission appreciates the opportunity to give proper attention to acquitted conduct, and we will do so this year," said USSC Chairman and federal judge Reeves.

"The Commission will continue to examine the career offender guidelines, including updating the data analyses and statutory recommendations made in the Commission's 2016 report to Congress entitled Career Offender Sentencing Enhancements. The Commission will also continue its consideration of alternative approaches to the 'categorical approach' through workshops convened to discuss the scope and impact of the career offender penalty enhancements. (It) will further continue its research agenda through examination of various issues, including methamphetamine offenses, sentencing differences for cases disposed of through trial versus plea, and sentences involving youthful individuals." The impact of these new changes is staggering, and promise a seismic change in sentencing practices and greatly increase the chances of success for post-conviction petitions.

There is still a lot of inconsistency as to how individual facilities are dealing with the Second Chance Act (SCA), FSA credits,

and RDAP sentence credits, which will require you to know certain facts. All of these credits CAN be combined. Although FSA credits are more easily calculated, SCA and RDAP are a bit more complicated. SCA applies to everyone, but what doesn't apply to everyone is how much you get, as the statute says "up to" a year, which provides the Bureau some wiggle room. However, if you are not getting around 6 months, start asking questions and sending memos. SCA is NOT optional; everyone gets it, and its denial is a clear abuse of discretion. There has also been a new memo issued that prevents the elimination of SCA, RDAP, or FSA credits on the basis of a detainer, immigration or otherwise.

From one institution: "last month when there was memorandum issued to the general population about how non-citizens too can be placed for RRC/HC as long as they don't have a final deportation order, the prison administration here in FCC Yazoo City Low 2 started to send detainer action letters for every immigrant whose names came up in rosters for a placement in RRC/HC, but this time a modified version of detainer action letter and included at the bottom about our eligibility for placement to RRC/HC under FSA."

From another: "ICE Agents showed up at FCI Loretto and told 22 inmates to sign "a final order" of deportation. This scheme is spreading. Many did not sign at the encouragement of a few. The Agents are saying they have the authority to do this, they do not, but how is the BOP condoning this activity?"

(Note: Prisoner "waivers" not executed in front of an immigration judge are not valid.)

Immigrants are also targeted by the Bureau's "Final Order" of deportation scheme. Even as the agency has recognized the illegality of their previous unlawful policy of denying FSA credits to those with detainers (which is not in the FSA), it has persisted in attempting to take advantage of prisoners with little access to legal assistance by engaging in a broad conspiracy with some ICE offices to obtain letters purporting to be "Final Orders." This is nonsense. File your remedies, and if you would be released or would be close to the door with the proper application of the disallowed FSA credits, we can assist with an emergency 2241.

In an interesting decision directly impacting physician prosecutions, a Third Circuit panel decision shows how factually-suspect the method used by federal prosecutors to prove up drug quantities in the sentencing of a doctor really is. In US v. Titus, No. 22-1516 (3d Cir. Aug 22, 2023):

"Though the prosecution bears a heavy burden of proof, we will not let it cut corners. Dr. Patrick Titus wrote thousands of prescriptions for controlled substances. The government properly proved that many of these prescriptions were unlawful, so we will affirm Titus's conviction. But many other prescriptions were lawful. And the severity of Titus's sentence depended on how many were not. Rather than review every patient's file, the government urged the court to extrapolate from a small sample. Yet the government failed to show that doing so would satisfy its burden to prove the drug quantity by a preponderance of the evidence. Because the court sentenced Titus without enough proof, we will vacate his sentence and remand for resentencing."

Congress will have to take action based upon the fact that the facilities of the federal prison system are functionally obsolete, unsafe, unhealthy, and violative of environmental guidelines that the feds force the rest of the country to follow. From Thomson, officials took drastic action in an attempt to curtail a prisoner hunger strike, based upon a laundry list of prisoner complaints. Every prison has defective facilities, not to mention malfunctioning medical equipment, which claimed the life of a Carswell prisoner this past month, due to sepsis from a broken dialysis machine. The proposals issued by the USSC for next year's action will bring all of this into sharper focus, and provide the basis for court petitions seeking release based upon unsafe conditions.

If you haven't already done so, make sure your loved ones subscribe to the newsletter to protect your access to this source of information. The Bureau loves to censor this and other newsletters.

Be not afraid and let not your heart be troubled.

Derek Gilna, Director of Research, JD, (De Paul Law School, 1975), MARJ, (Master of Restorative Justice), (Vermont Law School, 2020), Federal Legal Center, 133 W. Market, #171, Indianapolis, IN 46204; dgilna1948@yahoo.com (English newsletter and ALL inquiries, English or Spanish); federallc_esp@yahoo.com, Spanish newsletter, but NO inquiries. (This Newsletter is for Information Only and Does Not Constitute Legal Advice.)

```
CRWHB   606.00 *      FEMALE CUSTODY CLASSIFICATION FORM      *      10-25-2023
PAGE 001 OF 001                                                      14:30:02
                              (A) IDENTIFYING DATA
REG NO..:  99877-479           FORM DATE: 01-08-2023           ORG: CRW
NAME....:  SANTANA-CERANO, MARIBEL
                                         MGTV: MED/PSY
PUB SFTY: NONE                           MVED: N/A
                              (B) BASE SCORING
DETAINER: (0) NONE             SEVERITY.......: (3) MODERATE
MOS REL.: 92                   CRIM HIST SCORE: (00) 0 POINTS
ESCAPES.: (0) NONE             VIOLENCE.......: (0) NONE
VOL SURR: (0) N/A              AGE CATEGORY...: (2) 36 THROUGH 54
EDUC LEV: (2) NO VERFD HS/ NO GED   DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS
                              (C) CUSTODY SCORING
TIME SERVED.....: (3) 0-25%    PROG PARTICIPAT: (1) AVERAGE
LIVING SKILLS...: (2) GOOD     TYPE DISCIP RPT: (5) NONE
FREQ DISCIP RPT.: (3) NONE     FAMILY/COMMUN..: (4) GOOD


                    --- LEVEL AND CUSTODY SUMMARY ---
BASE  CUST  VARIANCE   SEC TOTAL   SCORED LEV  MGMT SEC LEVEL   CUSTODY   CONSIDER
 +7    +18    -2         +5        MINIMUM       N/A              IN      DECREASE


G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

TRULINCS 99877479 - SANTANA-CERANO, MARIBEL - Unit: CRW-H-N

---

FROM: 99877479
TO: Health Services Admin
SUBJECT: ***Request to Staff*** SANTANA-CERANO, MARIBEL, Reg# 99877479, CRW-F-A
DATE: 05/18/2023 12:31:12 PM

To: GAMEZ
Inmate Work Assignment: n/c

MS GAMES I BEEN MOVING TO ONE NOTRTH TODAY AND I DONT UNDERSTAND WHY BECAUSE I HAVE A OPEN WOUND INFECTED AND WAITING TO HAVE SURGERY AGAIN THIS IS EXACTLY WHAT HAPPEND THE FIRST TIME I CAME TO CARSWELL THEY PUT ME IN ONE NORTH AND END UP LIKE THIS IAM REALLOY SCARE TO GET WORDS AGAIN LIKE THE FIRST TIME AND HOW I SUPOST TO CLEAND MY WOUND THERE IN PUBLIC POPULATION RESTROM WITH NO SANATATION

TRULINCS 99877479 - SANTANA-CERANO, MARIBEL - Unit: CRW-H-N

---

FROM: 99877479
TO: AW Medical
SUBJECT: ***Request to Staff*** SANTANA-CERANO, MARIBEL, Reg# 99877479, CRW-H-N
DATE: 06/07/2023 04:43:24 PM

To: GAMEZ
Inmate Work Assignment: NC

MRS GAMEZ I WAS TOLD BY YOU THE DAY I WENT LOOK FOR HELP FOR MY WOUND TO NCC1 THAT THIS PAST MONDAY DOCTOR FROM OUTSIDE WERE COMING AND YOU PUT A NOTE FOR THEM TO SEE ME AS URGEN WELL NO ONE HAS CALL ME TILL TODAY I SHOW MY SELF TO SICK CALL ON THURSDAY 1 BECAUSE I WAS IN REALLY PAIN AND NURSE CLAIN TALK TO ME AND PRESCRIBE ANTIBIOTIC WITH OUT EVEN CHECK MY WOUND I COMPLAIN TO ANOTHER NURSE AND 2 HOURS LATER HE CALL ME BACK TO CLINEC AND SAID HE FORGET TO CHECK MY WOUND HOW CAN HE THEN PRESCRIBE MEDICATIONS WITH OUT KNOW ANYTHING OR SEEN MY WOUND IAM ON ANTIBIOTIC THAT I READY KNOW DONT WORK FOR ME MY PAIN ITS BAD AND HAVENT HEAR NOTHING FROM NO BODY

TRULINCS 99877479 - SANTANA-CERANO, MARIBEL - Unit: CRW-H-N

---

FROM: AW Medical
TO: 99877479
SUBJECT: RE:***Inmate to Staff Message***
DATE: 05/18/2023 02:42:02 PM

Inmate Santana-Cerano,
You were seen by PA Cates and discharged from the unit in stable condition. On 4/27/23 the nurse noted you were discharged from PT and no further wound care orders were written. While in PT, the therapist noted the wound has remained closed and you have been self-managing when the area drains by covering it with a dressing. Please go to sick call for additional instruction on managing the drainage and cleaning the area. Your provider has ordered a plastic surgery consultation. You will be placed on call out when the appointment is scheduled.

C. Moore, RN

---

From: ~^! SANTANA-CERANO, ~^!MARIBEL <99877479@inmatemessage.com>
Sent: Thursday, May 18, 2023 12:27 PM
Subject: ***Request to Staff*** SANTANA-CERANO, MARIBEL, Reg# 99877479, CRW-F-A

To: collins
Inmate Work Assignment: nc

i been living in ncc 1 for a year and then they move me to borders because pt said theres nothing they can do about my open wound has been open for a year and im waiting to go see surgeron out he said i need another surgery to fix my wound but today they move me to one north and i dont understand how iam going to take care of my wound there with no sanitation and thats exactly what happens a year ago when i came here send by a judge for medical attention and they put me in one north and i had really infected and end up how i am righ know with nerve damage for the rest of my life i have my attorney takeing care because iam really scare to get worst again

*(handwritten annotation, bracketing the AW Medical reply):* how they noted the wound remained close but I self-manging when the area drainage and how I need instructions on managing the drainage

*(handwritten at bottom):* My wound still open and draining